Filed 7/22/21  In re J.R. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | B307228 <br><br> (Los Angeles County  Super. Ct. Nos. 19CCJP04187, 19CCJP04187A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> M.R., <br><br> Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Martha A. Matthews, Judge.  Affirmed.

Megan Turkat-Schirn, under appointment by the Court of

Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, for Plaintiff and Respondent.

---

This is the second appeal arising out of the juvenile court's jurisdiction over J., the eight-year-old child of mother, M.R., and father, J.R. Father previously appealed from the court's jurisdictional and dispositional orders establishing jurisdiction over J. pursuant to Welfare and Institutions Code section 300, based on mother and father's conduct in repeatedly accusing each other of abusing J.[1] We dismissed the appeal, finding that the court would maintain jurisdiction over J. regardless of the outcome of the appeal and father's dispositional challenge was rendered moot by subsequent rulings.

Following another incident in which mother reported father harming J., the court sustained a section 387 supplemental petition and removed J. from both parents' custody. Mother now appeals. She challenges the sufficiency of the evidence to support the court's findings of jurisdiction over J. and that J.'s removal from parental custody was necessary to prevent substantial danger to him. We affirm.

## BACKGROUND

### *Original Petition, Jurisdiction, and Disposition*

Mother and father have one child together, J., born in 2013.[2] In January 2017, the family court granted mother's petition of annulment of her marriage to father. The court

---

[1]All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]Father is not a party to this appeal.

awarded mother primary physical custody of J. and granted father visitation every other weekend.

On June 28, 2019, the case was referred to the Los Angeles County Department of Children and Family Services (DCFS) after father brought J. to the sheriff's station to report abuse by mother. Mother had informed father earlier in the day that J. had fallen and sustained a bruise. However, when the babysitter dropped J. off for father's visitation, father noticed that J. had several fresh scratch marks on his face and body, and bruises on his thigh.

J. was interviewed by a sheriff's deputy and by a DCFS children's social worker (CSW). J. reported that mother was upset with him, scratched him, and hit him with her hands and a belt. According to the deputy, J. was unable to explain why mother was upset with him, but said that he was afraid of mother because "she hits him a lot and is mean to him." J. also stated that he was "afraid to tell anyone his mother was hurting him." J. told the CSW that when he ignored mother's command to stop playing, mother grabbed him by the arm and began slapping him on the face. J. explained the incident by moving "his right hand up and down in a rapid manner to his face." He also told the CSW that he got scratches on his arm or leg when "my mommy hit me." The sheriff's deputy conducted a full body assessment of J. and noted "numerous fresh deep red scratches on [J.]'s face, a lightly bruised right eye, scratches behind his neck, bruises on his left arm, a scratch on the back of his right arm, a fresh red scratch on the right side of his back, and a bruise on his left thigh."

Father told the CSW that he had made several prior reports about mother regarding her physical abuse and neglect.

3

He stated that he did not communicate with mother, because "all she does is argue." He also reported a 2018 incident in which he observed mother driving under the influence of alcohol with J. in the car.

Mother denied any abuse. She told the CSW that J.'s babysitter had a 10-year-old autistic son, and that while the babysitter was transporting both children, the son had a "temper tantrum episode," lashing out at J. and scratching him. Mother stated that since their separation, father had made multiple reports to DCFS alleging that she had abused the child, but that J. had attention-deficit/hyperactivity disorder (ADHD) and sometimes sustained scratches and bruises from rough playing. Mother also stated that J. informed her that father's girlfriend's children were mean to him and hit him, and that J. returned from visiting father with bruises. According to mother, father was "possessive and violent towards her" during their marriage, including pulling her hair and striking her in the face. She claimed that father refused to communicate with her directly, so she used an internet messenger program to discuss overnight visitation.

DCFS noted a pattern of ongoing physical abuse referrals by both parents against each other, including nine DCFS investigations for physical abuse and neglect between 2016 and 2018. Most of the incidents involved scratching or bruising and many included visits to the hospital for evaluation. In several of the incidents, J. reported that mother had hit him. The referrals were ultimately closed, mostly as inconclusive.

DCFS filed a dependency petition on July 2, 2019 on behalf of J. (then 6 years old) under section 300, subdivisions (a) and (b)(1). In counts a-1 and b-1, the petition alleged that mother had

4

physically abused the child, including on June 28, 2019, when she grabbed J. by his arm, slapped his face, and repeatedly struck his body with her hands and belt. The petition further alleged that mother had physically abused J. on prior occasions and that he was afraid of her. Count b-2 alleged that on a prior occasion, mother endangered J. by driving under the influence of alcohol while J. was in the vehicle. J. was detained from both parents and placed in shelter care.

In its jurisdiction/disposition report, DCFS reported a further interview with J. on July 15, 2019. J. denied being hit by mother or father and stated that only the babysitter's son scratched and "hit me too much on my legs and arms." J. reported that father, mother, and father's girlfriend were "nice." DCFS also spoke with the babysitter, a longtime family friend of mother, who confirmed that her son had scratched J. repeatedly on June 28, 2019. The babysitter also reported that during past custody exchanges, she heard J. state he did not want to go with father because father's girlfriend and her daughters were mean to him. She also said J. disclosed to her on multiple occasions that he witnessed father slap his girlfriend on the face. DCFS interviewed father's girlfriend, who denied these allegations. She previously told father she was uncomfortable caring for J. given mother's accusations of abuse against her.

In an interview on July 10, 2019, father reported that J. told him that mother hit him, and demonstrated with his hand. Mother denied the allegations, stating that she was at work during the incident and was notified by the babysitter that her son scratched and pinched J. Mother also denied father's report that she had previously driven with J. while intoxicated. Both parents reported concerns with J.'s safety when he was with the

other parent.

DCFS noted that J. had made inconsistent statements during the course of the investigation regarding his injuries, and further that J.'s "high energy and activity due to his diagnosis of ADHD" was a possible contributing factor for his past injuries. DCFS concluded that the injuries J. sustained on June 28, 2019 were caused by the babysitter's son. DCFS therefore recommended that the court dismiss counts a-1, b-1, and b-2 from the petition, as there was no evidence to support the allegations that mother physically abused J. or endangered him by driving under the influence.

However, DCFS requested a continuance to amend the petition to include a count of emotional abuse against father and mother, stating that in multiple prior referral investigations, father and mother "recycled prior allegations of abuse and neglect against each other to gain leverage regarding J[.]'s custody," and they "list[ed] significant concerns about each other to sabotage and demonize the other parent." DCFS noted a prior statement by father's girlfriend regarding an incident where J. had a bruise near his eye when father picked him up. Father asked J. what happened and J. stated that someone had hit him. Father called mother, had J. repeat what he said to mother, mother yelled for J. to "stop lying" and J. began to tremble. DCFS concluded that "due to the parents' strained history and current custody issues, it appears that the parents have chosen to place [J.] in the middle of their feud, and firmly ignore each other unless they are accusing each other of abusing and neglecting" J.

DCFS also noted J.'s behavior listed on his December 2018 individualized educational plan (IEP), including that J. "struggles in being able to obey classroom rules . . . writes on the

6

classroom walls, cries and yells when denied his own way, . . . and has been observed to destroy his own property." J. had also hit his peers and "often bothers other students" during lessons.

DCFS filed a first amended petition on July 23, 2019, adding allegations under section 300, subdivisions (b)(1) and (c). As amended, counts b-3 and c-1 alleged that mother and father "created a detrimental home environment" for J. by "accusing each other of abusing and neglecting" J. and reporting such abuse and neglect to law enforcement and child protection services "for the purpose of gaining and/or maintaining custody" of J. DCFS noted the incident in which father accused mother of neglecting J. in front of the child and mother yelled at J. to stop lying. The petition further alleged that J. showed behaviors indicating emotional distress, including hitting peers and destroying his own property, and that the conduct by mother and father placed J. "at substantial risk of suffering serious emotional damage and physical harm."

At the adjudication and disposition hearing on July 24, 2019, the court dismissed counts a-1, b-1, b-2, and c-1. As to the remaining count, b-3, the court found "substantial evidence of a pattern of conduct by both parents . . . the overall result has been to hurt their child." The court noted that the repeated abuse allegations by the parents began at the time of their separation and during the family court proceedings, and that there was an "obvious" pattern of conduct with mother and father accusing each other of causing injuries to J. The court continued, "If someone is going to accuse someone of physical abuse every time a six-year-old boy has a bruise, this child is going to have so many interactions with police and social workers that that in and of itself is going to harm the child. . . . [T]here just seems to be a

7

lot of reaction to things that are kind of normal during childhood being weaponized against each other, and it has to stop."  The court further noted that seeing his parents fighting over him could "cause very serious emotional harm" to J., and "although the child may have some learning problems, children act out their distress.  And some of the things the child has said to have done, hitting other people, destroying his own stuff, . . . this is a matter of common sense that would suggest that the child is feeling some emotional turmoil and kind of acting it out through his behavior" and "tend[s] to show that the child is being affected by all of this conflict that is going on over him."  The court concluded that DCFS had not established emotional abuse, but rather "a pattern of behavior that creates a risk of emotional harm to the child," which, in turn, created a risk of physical harm to J.

Accordingly, the court declared J. a dependent and sustained the amended count b-3, finding father's and mother's conduct placed J. at risk of suffering serious emotional damage and physical harm.  Over DCFS's objection, the court released J. to the home of both parents, with primary custody to mother and unmonitored, weekend visitation for father.  The court also ordered mother to use other childcare arrangements "unless and until the department has investigated the previous babysitter and determined that that would be a safe childcare arrangement."

### First appeal

Father appealed from the court's jurisdictional and dispositional findings.  Mother did not appeal.  DCFS filed a cross-appeal, challenging the court's dismissal of count c-1.  In our prior, unpublished opinion, *In re J.R.* (Nov. 2, 2020, No. B299814) (unpub. opn.), we dismissed father's appeal, declining

to reach the merits of the court's jurisdictional findings because mother's failure to appeal meant that the court would retain jurisdiction over J. regardless of the outcome of father's appeal. Additionally, father conceded that his challenge to the dispositional order was rendered moot based on subsequent proceedings, which we discuss further below. We also dismissed the cross-appeal by DCFS as moot.

***Section 342 subsequent petition***

In a last-minute information filed on August 20, 2019, DCFS reported that J. had participated in a forensic interview on August 5 to obtain "additional information/clarification" about the physical abuse to J. The evaluator reported that J. had a "speech delay" that made it difficult for the evaluator to understand him; J. also seemed to have difficulty understanding the evaluator and "great difficulty focusing." When asked about how he got the bruises on his face, J. first said he forgot, then said that the babysitter's son "smacked" him. When asked about discipline by mother, J. stated, "I no get in trouble . . . I no break no rules . . . her don't hit me." DCFS also reported that mother continued to participate in parenting and anger management classes.

DCFS filed a status review report on December 31, 2019. It recommended continued family maintenance services for mother and father, noting that both parents had demonstrated positive changes, but made "little progress" with their case plans. DCFS assessed both parents as a "moderate" risk of future abuse and neglect. Both parents expressed a desire to co-parent in a peaceful manner. J. stated that he liked living with mother and visiting father. At a status review hearing on January 23, 2020, the court found continued jurisdiction necessary, and that mother

9

was in compliance with the case plan. The court ordered continued family maintenance services, with the goal of closing the case and terminating jurisdiction by April 2020.

On January 24, 2020, DCFS received a call from mother reporting physical abuse by father. According to mother, on January 23, 2020, father took J. to the bathroom while the family was at the courthouse waiting for the status review hearing. Later that afternoon, J. told mother that while in the bathroom, father checked J.'s body for marks and bruises. Father then purposely scratched J. on his back, resulting in two visible scratches, each several inches long. Mother stated that J. did not have any scratches when she bathed him that morning. Mother also brought J. to the police station on January 24, 2020 making the same allegations. The reporting police officer stated that J. had visible bruising and two scratches on his back. The police officers expressed concern that the marks did not appear to be scratches as mother reported, but rather bruises, and that given the family's extensive history, mother and father continued to blame one another and "it is unknown which if not both parents are inflicting injuries on the child."

The CSW assessed J. and reported that he had two "linear purple and green color marks" on his lower back, which did not appear to be scratches. The CSW interviewed J. privately. J. confirmed that father took him to the bathroom and scratched him with two fingers. When asked why father scratched him, J. responded, "because he wants my mom to get in trouble." J. stated he did not tell mother until they left the courthouse because he did not want to see his parents arguing. He also said he did not want "to go with daddy anymore because he's mean." When asked if mother told him to tell DCFS anything, J. said,

10

"tell the worker your daddy did it. Because my dad wants my mom to go to jail because he wants me all day." He denied that mother hurt him in any way. J. denied mother hitting him as a form of discipline, but stated that father "smacks me everywhere."

Given the conflicting information regarding J.'s injuries, DCFS arranged for a forensic examination. The investigating police officer asked mother for an explanation if the examination concluded that the injuries had been sustained several days earlier, instead of the day before as she claimed. Mother "became very emotional and defensive," stated she did not do anything, but was "unsure" about an explanation. She stated that perhaps J. could have sustained the injury at school, but could not elaborate. The forensic examination concluded that the marks were consistent with scratches, but likely not made with fingernails, rather may have been caused by an object.

DCFS interviewed father on January 29, 2020. Father confirmed that he took J. to use the bathroom while in court. Father denied scratching J. and said that mother manipulated J. to report that father hit him. Father blamed mother for the marks and said that he wanted DCFS to remove J. from mother and father so that J. would not continue to be physically abused by mother.

DCFS contacted mother on January 30, 2020 to advise her that the department was seeking a warrant for J.'s removal from mother and father. Mother stated that J. was with the babysitter, but admitted that the court had previously told mother not to leave J. in the babysitter's care, given the prior injuries caused by the babysitter's son. Mother did not have an explanation for her failure to follow the court's order. In the

11

detention report, DCFS concluded that the marks were not consistent with the explanation given by mother and J., as they did not appear to have been made by fingernails, and appeared to be more than a day old. DCFS also reported that, based on J.'s statements, "it appears that the child has been coached." DCFS noted that it appeared neither parent had benefitted from court services, as J. "continues to be re-abused, while left with marks and bruises and explanations for such marks and bruises do not coincide with the coloration and size of the marks."

DCFS filed a subsequent petition on February 4, 2020 under section 342,[3] alleging dependency jurisdiction under section 300, subdivisions (a) and (b)(1). Counts a-1 and b-1 alleged that J. was medically examined on January 24 and found to have a linear bruise on his back, which was "not consistent with explanations of the manner in which the child sustained the injuries," and "would not ordinarily occur except as the result of deliberate, unreasonable and neglectful acts" by the parents.

At the detention hearing on February 5, 2020, the court removed J. from the custody of his parents and ordered him placed into shelter care. The court further ordered monitored visitation for both parents.

### Section 387 supplemental petition

DCFS filed a supplemental petition under section 387[4] on

---

[3]In a subsequent petition under section 342, DCFS "alleges new facts or circumstances, other than those under which the original petition was sustained, sufficient to state that the minor is a person described in Section 300."

[4]Under section 387, DCFS may file a supplemental petition seeking an order "changing or modifying a previous order by removing a child from the physical custody of a parent," upon a showing that "the previous disposition has not been effective in

12

February 26, 2020.  The petition added count s-1, alleging that the previous disposition was not effective in protecting J., as mother and father "continued to establish a detrimental and endangering home environment" for J. by continuing to accuse each other of abuse and neglect, including blaming each other for the latest marks found on J.'s back.  The petition further alleged that "[r]emedial services failed to resolve the family problems."

DCFS filed a jurisdiction/disposition report on February 27, 2020.  J. spoke with a CSW at his foster placement on February 14.  The CSW reported that J. was "cooperative and friendly," free of marks and bruises, and was able to identify the difference between telling truth and a lie.  J. stated that he was living with the foster family because father scratched him on his back while they were in the bathroom.  J. said he did not know why father scratched him, father did not say anything at the time, and J. did not feel it happen and did not cry.  J. also said that when mother saw the scratches, she told J. that "they were going to take me away from her and my dad," and that father had scratched J. "because he wants my mom to go to jail."  DCFS interviewed mother on February 20.  She stated that during their relationship, father was "very abusive both verbally and physically."  She claimed that she and father had been "having problems ever since" their separation, but denied that she had ever hurt J.  DCFS also spoke with father on February 12.  He reported that mother used to hit J. "with shoes and with her hands" and "has always been aggressive towards" the child.  Father stated that he would never hurt J., and that the judge saw J. immediately after the alleged scratching incident and J. was "not in any distress."

_____

the rehabilitation or protection of the child."

13

DCFS spoke with J.'s foster mother, who also cared for J. during his prior detention in June 2019. The foster mother reported that J. had started to "pound on his legs when frustrated," which he had not done before. Additionally, she told the CSW her concern that mother called J. "all day," crying while on the phone, which disrupted J.'s routine and upset him. DCFS also noted that J. had been diagnosed with ADHD and it had been recommended that he also be evaluated for autism.

DCFS concluded it was unlikely that father deliberately injured J. "in a public setting minutes prior to a court hearing." The report also noted that the marks did not seem to be fingernail scratches, and did not appear fresh as mother and J. claimed. DCFS stated it could not determine who caused the marks on J.'s back or when they occurred. DCFS therefore recommended that the section 342 petition be dismissed. With respect to the remaining count s-1 of the section 387 supplemental petition, DCFS noted that J. was "in the middle of a custody battle between the parents and as a consequence appears to be confused as to his feelings and what is going on between his parents." DCFS cited J.'s conflicting statements that father was mean to him and that father was never mean, and J.'s report that mother told him that father only loved father's girlfriend. DCFS opined that mother's behavior "may be overbearing and excessive" including calling J. up to 10 times a day in foster care, which upset the child. DCFS concluded that the parents "have not benefitted from any services and continue to blame one another for causing harm to the child," and that it was "clear that the child continues to be manipulated and his emotional wellbeing is being jeopardized by his parents."

J. received individual therapy from November 2019 to February 2020, ending when he was placed in foster care. He was diagnosed with ADHD, with symptoms including that he was easily distracted, had difficulty following directions and sitting still, had temper tantrums, threw books in class, threw himself on the floor, and was "always running and climbing on things." In a status review report in May 2020, mother and J. both reported that J. no longer threw objects in the classroom. He was being assisted at school by an assigned aide, due to his tendency to run out of the classroom. During the COVID-19 pandemic in 2020, J. received home schooling at his foster placement.

In its May 2020 report, DCFS opined that "[a]t this time, it is not appropriate to return" J. to mother or father. DCFS noted that mother had "demonstrated some positive changes during the last five months, has demonstrated a commitment to caring for J[.] and participating in Court ordered services." However, "despite some positive changes, there has been little progress made with Mother's case plan in relation to peaceful co-parenting. [Mother] would benefit from continuing to participate in services." DCFS made the same conclusions regarding father. DCFS assessed J. as a "high risk" of future abuse and neglect from mother and father. DCFS noted that the goal of services following the prior referral in July 2019 was to "provide resources and support in order for Mother and Father to learn healthy behaviors around co-parenting and conflict resolution and learn how to communicate using peaceful co-parenting skills. The goal was also for the parents to understand the impact that unhealthy co-parenting behaviors have on a child being that J[.] was struggling with hyperactivity."

15

DCFS filed a last-minute information on May 8, 2020. Due to the pandemic, visitation between J. and his parents was conducted remotely starting in March 2020. Mother participated in monitored virtual visits with J. three times per week, with no significant concerns reported. DCFS filed an additional last-minute information on August 7, 2020. J.'s foster mother observed that during father's visits, he did not greet or engage with J. She also reported that during mother's virtual visits, mother would often make J. show her his body so that mother could inspect it for marks and bruises. J.'s foster mother stated this was concerning, as J. became upset about any "mark" he had, even if caused by normal activities. According to the foster mother, J. would have panic attacks and start crying uncontrollably if he had a scratch on his body, saying "I can't have a mark! That means I'm going to be here forever!" DCFS also noted that mother completed another parenting class in July 2020.

At the adjudication and disposition hearing on August 20, 2020, the court dismissed the section 342 petition at the request of DCFS. Turning to the section 387 supplemental petition, both counsel for DCFS and J.'s counsel urged the court to sustain the petition. Mother's counsel noted that since February when the section 342 and section 387 petitions were filed, she had "essentially completed her entire case plan" plus a second parenting class. Mother's counsel acknowledged that there was a "bitter high-tension relationship" between mother and father and that J. was "understandably confused by family dynamics." But he argued that "being merely upset or confused is not really jurisdictional. There needs to be something more, something that

16

would lead to this child experiencing long term harm." He argued that mother was "entitled to inspect the child for injuries" and was "essentially being punished for investigating her case." He also argued that DCFS had not met its burden to justify removing J. from mother. Father's counsel argued for dismissal of the petition as to father, arguing that mother was the one harming J.'s emotional well-being.

The court noted that it was "an unusual situation where the case originally came in as a physical abuse case," but DCFS's current position was that "the conflict between the parents is so severe that the only way to protect the child is to remove him from both of his parents." The court stated it was looking at jurisdiction and disposition together, and found that DCFS had met its burden "even by clear and convincing evidence as to mother, [because] even though mother has done her case plan, she seems to have a complete lack of insight about how her behavior is harmful to the child. This whole business about her having the child show his body parts to make sure he doesn't have marks and bruises, of course it's appropriate for a professional social work investigator to do that . . . but that doesn't mean that in this context it's appropriate for a parent to engage in this behavior when the case is really about emotional harm to the child caused by essentially the child being used as a weapon in a conflict between the parents. And the fact that mother persists in that exact behavior really shows a lack of insight as to how she is harming her child by continuing to search for evidence that the father has abused him." The court also cited mother's multiple daily phone calls to J. and her behavior "crying while she's calling on the phone," concluding that "there just really doesn't seem to be any insight as to the serious

17

emotional impact of mother's behavior on the child."

The court indicated it thought it was a closer question as to father, since he had not recently accused mother of abuse, but ultimately concluded that it "would be unsafe to release the child to either parent because it appears that the parents are still so tangled up in their conflict with each other that neither of them is engaging with the child in a healthy manner." The court also found a risk of physical harm to J., noting that J. said that father was accused of leaving marks on him but "I did it to myself," and finding a "history of this child self harming due to emotional distress, and that does seem to be still happening." The court acknowledged that removal was "a drastic outcome, but I just don't see any other way to stop the child from being torn apart by these parents. Doing programs is one thing, but the point of doing programs is to actually change your behavior. . . . Even after going through all of these programs, the mother is still making the child show her his body and causing extreme anxiety for the child." Thus, the court concluded that "sadly, removal is the only way to avoid harm."

Accordingly, the court sustained count s-1 as to both mother and father, finding that the prior disposition was not effective in protecting J. The court also found removal from mother and father was necessary and ordered monitored visitation for both parents. Mother timely appealed from the August 20, 2020 order.

## DISCUSSION

Mother appeals from the court's order sustaining the section 387 petition and removing J. from her care. She argues that the court erred in its initial exercise of jurisdiction under section 300, subdivision (b) and therefore lacked substantial

evidence to sustain the section 387 petition on the same basis. She also contends that the court lacked substantial evidence to find there were no reasonable alternatives to removal. We find no error and therefore affirm.

**I.    *Legal Standards***

DCFS may file a section 387 supplemental petition when the juvenile court has already assumed jurisdiction over a minor but the previous disposition has not been effective in protecting the child.  Thus, a "section 387 supplemental petition is used to change the placement of a dependent child from the physical custody of a parent to a more restrictive level of court-ordered care."  (*In re T.W.*(2013) 214 Cal.App.4th 1154, 1161, citing § 387; Cal. Rules of Court, rule 5.560(c).)  "In the jurisdictional phase of a section 387 proceeding, the court determines whether the factual allegations of the supplemental petition are true and whether the previous disposition has been ineffective in protecting the child.  [Citations.]  If the court finds the allegations are true, it conducts a dispositional hearing to determine whether removing custody is appropriate."  (*In re T.W., supra,*214 Cal.App.4th at p. 1161, citing § 387, subd. (b); see also Cal. Rules of Court, rules 5.565(e)(1) and (e)(2); *In re H.G.* (2006) 146 Cal.App.4th 1, 11.)

"A section 387 petition need not allege any new jurisdictional facts, or urge different or additional grounds for dependency because a basis for juvenile court jurisdiction already exists."  (*In re T.W., supra,* 214 Cal.App.4th at p. 1161; see also *In re Joel H*. (1993) 19 Cal.App.4th 1185, 1200 ["The law does not require that a fact necessary to establish jurisdiction under section 300 be established to warrant a change in placement"].)  The only "jurisdictional fact" necessary to modify a previous

19

placement is that the previous disposition has not been effective in protecting the child. (§ 387, subd. (b); *In re Joel H., supra,* 19 Cal.App.4th at p. 1200; see also *In re T.W., supra,* 214 Cal.App.4th at p. 1161.)

We review challenges to the sufficiency of evidence supporting the court's findings on a section 387 petition for substantial evidence. (See *In re T.W., supra,* 214 Cal.App.4th at p. 1161; *In re Henry V.* (2004) 119 Cal.App.4th 522, 529.) "'"'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] '"[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate].'"'"'" (*In re I.J.* (2013) 56 Cal.4th 766, 773; see also *In re T.W., supra,* 214 Cal.App.4th at pp. 1161-1162.) The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order. (*In re E.E.* (2020) 49 Cal.App.5th 195, 206; *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

## II.    *Jurisdiction*

Mother recognizes that the section 387 supplemental petition did not provide a new basis for jurisdiction; rather, the court retained jurisdiction established under the initial section

300 petition.  She argues, however, that the court lacked substantial evidence to make its original jurisdictional finding that J. was at risk of serious physical harm under section 300, subdivision (b).

Mother did not previously appeal from the court's jurisdictional and dispositional orders in 2019 and she cannot challenge those findings in her appeal from the court's later order on the supplemental petition.  "[A]n unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order."  (*In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1149–1150, citing section 395; see also *In re Edward H.* (1996) 43 Cal.App.4th 584, 590-591; *Wanda B. v. Superior Court* (1996) 41 Cal.App.4th 1391, 1395-1396.)

As such, the only jurisdictional question before the court at the time of the section 387 petition was whether the previous disposition was ineffective in protecting J.  We conclude that substantial evidence supports the court's finding that it was.  At the initial adjudication and disposition in July 2019, the court found that the parents' pattern of accusing each other of abuse could "cause very serious emotional harm" to J., which, in turn could cause physical harm.  The court also noted that J.'s behavior indicated that he was acting out his distress over the conflict.  However, the court declined to remove J. from his parents' custody.  In the following six months, despite mother's progress with her court-ordered programs, DCFS reported that she demonstrated little improvement in her ability to co-parent with father and minimal insight into the harm such conflict could cause to J.  Indeed, in January 2020, mother reported that father had abused J. in a courthouse bathroom, although the details

21

provided by both mother and J. were neither credible nor consistent with his wounds. J. also reported that mother had told him to "tell the worker your daddy did it. Because my dad wants my mom to go to jail."  Mother also continued to use the same babysitter for J. despite his prior injuries from her son and contrary to the court's express order.  After J. was placed in foster care, mother called him repeatedly, demanding inspection of his body and resulting in distress to J. over any injury.  Under these circumstances, substantial evidence supported the trial court's conclusion that the prior disposition returning J. to mother's care was ineffective in protecting the child, as mother's behavior persisted despite her participation in services.

**III.**   *Removal*

Mother also challenges the court's finding that removal was necessary. When a section 387 petition seeks to remove a minor from parental custody, the court applies the procedures and protections of section 361.  (*In re T.W.*, *supra*, 214 Cal.App.4th at p. 1163; *In re Paul E.* (1995) 39 Cal.App.4th 996, 1001–1003.) Before a minor can be removed from the parent's custody, the court must find, by clear and convincing evidence, "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."  (§ 361, subd. (c)(1); *In re Javier G.* (2006) 137 Cal.App.4th 453, 462.)

"A removal order is proper if it is based on proof of:  (1) parental inability to provide proper care for the minor; and (2) potential detriment to the minor if he or she remains with the

22

parent. [Citation.] The parent need not be dangerous and the minor need not have been harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re T.W., supra*, 214 Cal.App.4th at p. 1163, citing *In re Jamie M.* (1982) 134 Cal.App.3d 530, 536.) We conclude substantial evidence supports the court's removal order.

The record supports a finding that mother was unable to provide proper care for J. and that he would be at risk of harm if he remained in her custody. Following four years and multiple unsubstantiated abuse referrals by both parents, the court assumed jurisdiction over J. in 2019. Afterward, mother continued to use J. as a weapon in her custody battle against father, again accusing father of abuse in January 2020. As a result of these accusations, J. was subjected to unnecessary examinations and interviews by police. There was also evidence supporting the conclusion that mother coached J. to level the same accusations against father—the child echoed mother's story about father scratching him, told DCFS that mother had told him to do so, and further said that mother told him he would be taken away from his parents and that father wanted mother to go to jail. J. also alternately expressed that father was "mean" and "nice" and stated that mother told him that father only loved father's girlfriend. As the trial court found, mother's persistence in the same behavior demonstrated a lack of insight into how her continued conduct was causing emotional harm to J.

Mother continued her harmful behavior after J. was detained and placed in foster care pending the section 387 hearing, by calling J. repeatedly and insisting on examining his body. As the foster mother reported, mother's behavior caused J. extreme anxiety; she stated that J. would suffer panic attacks,

23

cry uncontrollably, and state, "I can't have a mark!  That means I'm going to be here forever!" J. had also started hitting his legs when upset.  Additionally, J. denied being injured by father, stating, "I did it to myself."  As such, substantial evidence supported the court's finding that mother's behavior was causing serious emotional harm to J. and that emotional distress resulted in a risk of serious physical harm, including from J. harming himself.

We are not persuaded otherwise by mother's contention that this case is merely a family law custody dispute with evidence of some emotional distress but no risk of physical harm.  For example, in *In re John W.* (1996) 41 Cal.App.4th 961, 974, cited by mother, "neither parent was adjudged to pose any danger to the child" and the juvenile court had terminated jurisdiction.  Thus, the court found it appropriate to remand the case to the family law court, remarking that "[t]he juvenile courts must not become a battleground by which family law war is waged by other means." (*Id.* at p. 975.)  Here, by contrast, the juvenile court found that the parents' use of J. as a "weapon" in their ongoing battle *was* causing a risk of harm to the child, both emotional and physical.

Substantial evidence also supports the juvenile court's finding that reasonable efforts were made to prevent or eliminate the need for J.'s removal from mother's custody.  (§ 361, subd. (d); *In re D.D.* (2019) 32 Cal.App.5th 985, 997 [reasonable efforts were made to prevent or eliminate the need for removal where extensive and reasonable services had been provided to mother and children]; *In re Javier G., supra*, 137 Cal.App.4th at p. 464 [same].)  Mother and J. were provided with extensive services throughout the pendency of the case and before J. was removed

24

from mother's custody for the second time. These services included therapy for both mother and J., and parenting and anger management classes for mother. J. was returned to mother's custody in July 2019. But mother's conduct continued despite her participation in services. The social workers and police officers investigating these claims reported to the court that because of the extreme conflict between the parents, they were unable to assess the source of J.'s injuries.

Given mother's continued lack of insight into the harm caused by her behavior, the trial court concluded that it had no means to protect J. absent removal. Mother's suggestion that the court could have ordered her to stop checking J. for bruises or not to make further referrals against father ignores the repeated warnings given by the court and by DCFS over her conduct. Further, although mother suggests the court could have required the parents to attend conjoint counseling, the court did consider this option, but expressed concern that it was not appropriate given the level of toxicity between the parents.

"The trial court is in the best position to determine the degree to which a child is at risk based on an assessment of all the relevant factors in each case." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 766.) On this record, we cannot agree with mother that there was insufficient evidence to remove J. from her and father.

## DISPOSITION

The orders sustaining the supplemental petition under section 387 and removing J. from his parents' custody are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


MANELLA, P. J.


WILLHITE, J.

26